T.C. Memo. 2001-143

UNITED STATES TAX COURT

TOMMY OWENS, JR. AND DAWN R. OWENS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11069-99.                    Filed June 19, 2001.

Tommy Owens, Jr., and Dawn R. Owens, pro sese.

<u>Angela J. Kennedy</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined deficiencies in,
additions under section 6651(a)(1)[1] to, and accuracy-related
penalties under section 6662(a) on petitioners' Federal income
tax (tax), as follows:

_____

[1]All section references are to the Internal Revenue Code in
effect for the years at issue.  All Rule references are to the
Tax Court Rules of Practice and Procedure.

| Year | Deficiency | Addition to Tax Under Sec. 6651(a)(1) | Accuracy-Related Penalty Under Sec. 6662(a) |
|------|-----------|----------------------------------------|---------------------------------------------|
| 1993 | $3,879 | $970 | $776 |
| 1994 | 8,627 | 2,157 | 1,725 |
| 1995 | 2,276 | 569 | 455 |

The issues remaining for decision[2] are:

(1)  Do petitioners have unreported Schedule C gross receipts for each of the years at issue in the amount determined in the notice?  We hold that they do.

(2)  Are petitioners entitled to Schedule C deductions for each of the years at issue for "Car and truck expenses" (Schedule C car and truck expenses) in excess of the amount that respondent allowed in the notice?  We hold that they are not.

(3)  Are petitioners required to include in income for each of the years 1994 and 1995 certain insurance proceeds that they received during each such year?  We hold that they are.

(4)  Are petitioners entitled for any of the years at issue to a net operating loss deduction under section 172(a)?  We hold that they are not.

---

[2]At trial, petitioners conceded that if the Court were to sustain respondent's determinations with respect to Schedule C, Profit or Loss From Business (Schedule C), of petitioners' tax return (return) for each of the years at issue, they would be liable for self-employment tax for each of those years, as determined in the notice of deficiency (notice).  In that event, they would be entitled to a self-employment tax deduction for each of those years, as determined in the notice.

At trial, petitioners also conceded that if the Court's resolution of the issues remaining for decision were to result in an underpayment for any of the years at issue, they would be liable for any such year for the accuracy-related penalty under sec. 6662(a).

(5) Are petitioners liable for each of the years at issue for the addition to tax under section 6651(a)(1)? We hold that they are.

## FINDINGS OF FACT[3]

Some of the facts have been stipulated and are so found.

At the time the petition was filed, petitioners resided in Indianapolis, Indiana (Indianapolis). Petitioner Tommy Owens, Jr. (Mr. Owens) and petitioner Dawn R. Owens (Ms. Owens) had moved to Indianapolis from Toledo, Ohio (Toledo), in 1988 and 1990, respectively.

From January through April 1993, petitioners resided in a mobile home and paid lot rent to Happy Hollow Trailer Lodge. During that period, their monthly lot rent was $150. During 1993, petitioners paid rent and fees in connection with their mobile home totaling $505 and also paid for their telephone, cable, and electricity usage at that mobile home.

Starting in May 1993, petitioners rented a house on Walker Street in Indianapolis (Walker Street property) in which they lived until May 1994. Petitioners made monthly rent payments of $400 for the Walker Street property to Holly Paul. During 1993, petitioners paid at least $2,420 of rent and/or fees to Holly Paul, and during 1994 they paid at least $1,000 of rent to Holly

---

[3]Although not expressly stated, our Findings of Fact and Opinion pertain to the years at issue unless otherwise indicated or expressly stated for clarity.

Paul.  Throughout the period during which petitioners lived in the Walker Street property, they also paid for their electricity, gas, and telephone usage at that property.

In May 1994, petitioners moved to 1728 East Tabor Street, Indianapolis (East Tabor Street property).  On August 1, 1994, Mr. Owens assumed a mortgage on the East Tabor Street property from Douglas H. Tussey (Mr. Tussey).  On August 3, 1994, Mr. Tussey executed a warranty deed conveying the East Tabor Street property to Mr. Owens.  On the same date, petitioners purchased homeowner's insurance from State Farm Insurance Company for which they paid an annual premium of $265.  During 1994, petitioners paid a total of $10,354.50 to Mr. Tussey and a total of $1,000 to Re-Max Preferred Realty toward the purchase of the East Tabor Street property.

The mortgagee for the East Tabor Street property was America's Mortgage Servicing, Inc., later known as First Nationwide Mortgage Corporation.  During 1994, petitioners made mortgage payments totaling at least $1,050.13 to America's Mortgage Servicing, Inc.  During 1995, they made mortgage payments of at least $3,192.14 to America's Mortgage Servicing, Inc., later known as First Nationwide Mortgage Corporation.  Throughout the period during which petitioners resided at the East Tabor Street property, they also paid for their gas, telephone, water, and electricity usage at that property.

Petitioners were the only individuals who lived in the various residences that they occupied during the years at issue. During those years, they did most of their grocery shopping at Sam's Club.

During the years at issue, petitioners did not inherit any money or property, nor did they apply for, or receive, any bank loans.

Petitioners maintained a joint bank account, account No. 8011127, at National City Bank (National City joint account) until May 18, 1993, when they closed that account. As of December 31, 1992, the balance in petitioners' National City joint account was $5.51. On February 10, 1993, petitioners opened a joint bank account, account No. 91138256, at Peoples Bank (Peoples joint account) and made an opening deposit into that account of $2,000. As of December 31, 1993, the balance in petitioners' Peoples joint account was $8,873.21.

In 1988, Mr. Owens started a painting business (painting business) which he continued to own and operate during the years at issue and which was petitioners' primary source of income during those years. Ms. Owens assisted Mr. Owens in his painting business and was paid nonwage compensation of $1,700 during 1993 and $1,900 during 1995.

Mr. Owens' painting business undertook primarily industrial and commercial painting jobs. In those jobs, Mr. Owens served

primarily as a subcontractor who performed painting work for various general contractors, although occasionally he performed work directly for various owners of small businesses.

Petitioners, who did not maintain a separate bank account for Mr. Owens' painting business, generally deposited receipts from Mr. Owens' painting business into the National City joint account that they maintained until May 18, 1993, and thereafter into the Peoples joint account that they maintained.

Mr. Owens conducted his painting business both inside and outside his home State of Indiana. He conducted that business outside of Indiana in Ohio, Michigan, Kentucky, and Illinois. While performing painting jobs outside the State of Indiana, Mr. Owens received a lot of cash payments for his work. That was because it would have been virtually impossible for him to have cashed any checks received while conducting his painting business outside the State of Indiana.

During 1993, 1994, and 1995, petitioners owned an Astro van, a "box" truck (truck), and a Ford van. During 1995, petitioners also purchased a minivan. Mr. Owens used at least in part one or more of the vehicles that petitioners owned in conducting his painting business. Petitioners did not keep a contemporaneous log of their business mileage. Nor did petitioners determine as of the beginning and the end of each of the years at issue the odometer readings for any of the vehicles that they owned.

During 1993, 1994, and 1995, petitioners paid cost of goods sold for Mr. Owens' painting business totaling $24,121, $64,514, and $91,607, respectively.

During 1993, 1994, and 1995, petitioners paid business expenses for the painting business, excluding amounts paid for Schedule C car and truck expenses, totaling $29,710, $34,023, and $71,453, respectively.

During 1993, 1994, and 1995, petitioners incurred $2,466.62, $7,355.11, and $9,718.11, respectively, for parts, repairs, and purchases for their vans and truck. During each of those years, petitioners also incurred expenses for gasoline for those vehicles.

Petitioners received insurance proceeds during 1994 and 1995 in the amounts of $4,300 and $4,700, respectively, as reimbursements for certain of Mr. Owens' tools that he had used in his painting business and that had been stolen in prior years. Petitioners had deducted the cost of those stolen tools on returns that they had filed prior to 1994 and 1995.

During the years at issue, petitioners owned rental property located in Toledo (Toledo rental property), which constituted another source of income to them during those years. Petitioners' mortgage with respect to the Toledo rental property was held by Mid American National Bank, and they also had a second mortgage on that property with Northriver Development Corporation.

During 1993, 1994, and 1995, petitioners paid rental expenses with respect to the Toledo rental property totaling $6,668, $6,330, and $10,239, respectively.

The only records that petitioners maintained with respect to Mr. Owens' painting business and the Toledo rental property were their bank statements and the checks written on the joint bank accounts that they maintained (the National City joint account until May 18, 1993, and thereafter the Peoples joint account). Petitioners prepared from those bank statements and checks a monthly listing of the checks (petitioners' monthly listing) that they wrote. Petitioners' monthly listings, when totaled for the months during each of the years at issue,[4] showed that petitioners wrote checks for labor costs on the joint bank accounts that they maintained (the National City joint account until May 18, 1993, and thereafter the Peoples joint account) that totaled $18,784.75 for 1993, $43,038.38 for 1994, and $74,545 for 1995.

During 1995, petitioners purchased property located on Miller Street in Indianapolis (Miller Street property) for which they paid at least $1,222. In addition, during that year, petitioners made downpayments totaling $10,090 toward the purchase of property located on Massachusetts Street (Massachusetts

---

[4]Petitioners' monthly listings for 1993 that are in the record do not include petitioners' monthly listing for May 1993. Instead, petitioners' monthly listings for 1993 that are part of the record include petitioners' monthly listing for May 1996.

Street property).[5]  With respect to the Massachusetts Street property, petitioners also made during 1995 at least (1) one mortgage payment of $1,000, (2) a payment of $292.56 with respect to telephone service, and (3) payments totaling $220.79 for materials.

Ms. Owens visited her mother in Lebanon, Missouri (Lebanon), at least twice each year.  Ms. Owens' visits to her mother usually lasted between one week and one month.  During 1994, Ms. Owens was snowed in during one of those visits.  As a result, Ms. Owens stayed in Lebanon for two months.  When Ms. Owens traveled to visit her mother in Lebanon, she took money with her for her expenses.  During 1994, when Ms. Owens stayed for two months because of a snowstorm, Mr. Owens wired her some money.

Mr. Owens filed Form 1040, U.S. Individual Income Tax Return, for taxable year 1990, which showed a loss for that year of $13,779.  Mr. Owens and Ms. Owens jointly filed a return (joint return) for each of the taxable years 1991 and 1992. Those joint returns showed losses for 1991 and 1992 of $5,817 and $31,843, respectively.  The loss that Mr. Owens reported in his 1990 return was equal to the loss that he claimed in Schedule C of that return, reduced by $121 of taxable interest that he reported in that return.  The loss that petitioners reported in

---

[5]The record does not disclose the location of the Massachusetts Street property.

their joint return for 1991 was equal to the loss they claimed in Schedule C of that return, reduced by $39 of taxable interest that they reported in that return. The loss that petitioners reported in their joint return for 1992 was equal to the loss that they claimed in Schedule C of that return.

On December 27, 1996, petitioners filed a joint return for taxable year 1993, which showed a loss of $6,520. On December 26, 1996, petitioners filed joint returns for taxable years 1994 and 1995, which showed losses of $1,729 and $35,532, respectively. The loss that petitioners reported in their joint return for each of the years at issue was equal to the total of the loss claimed in Schedule C and the loss claimed in Schedule E, Supplemental Income and Loss (Schedule E), of each such return.

In Schedules C of petitioners' joint returns for 1993, 1994, and 1995, petitioners reported (1) Schedule C gross receipts of $66,779, $112,610, and $152,870, respectively; (2) Schedule C cost of goods sold of $24,121, $64,514, and $91,607, respectively; (3) Schedule C gross income of $42,658, $48,096, and $61,263, respectively; (4) Schedule C expenses of $46,510, $48,813, and $93,953, respectively; and (5) Schedule C losses of $3,852, $717, and $32,690, respectively. Included within the claimed Schedule C cost of goods sold for the years 1993, 1994, and 1995 was claimed cost of labor in the amounts of $20,766,

$48,503, and $86,950, respectively.[6] Petitioners included the nonwage compensation of $1,700 and $1,900 that Ms. Owens received from Mr. Owens' painting business during 1993 and 1995, respectively, in calculating the cost of labor claimed in Schedules C of their respective joint returns for those years. However, Ms. Owens did not report the respective amounts of such nonwage compensation in petitioners' joint returns for 1993 and 1995.

For each of the years at issue, petitioners computed the gross receipts from Mr. Owens' painting business that they reported in Schedule C for each such year by totaling the bank deposits that they had made during each such year. They provided the resulting total of those deposits for each of the years at issue to their tax return preparer (return preparer) for reporting in Schedule C of their return for each such year.

For each of the years at issue, petitioners computed the expenses, with the exception of the Schedule C car and truck expenses, that they claimed in Schedule C for each such year by categorizing the checks they had written during each such year and then totaling each category of expense. They provided the resulting total for each such category for each of the years at issue to their return preparer for reporting in Schedule C of

---

[6]The amounts of the cost of labor for 1993, 1994, and 1995 that petitioners claimed as part of the claimed Schedule C cost of goods sold for those years exceed the respective amounts of labor costs that are reflected in petitioners' monthly summaries for those years.

their return for each such year.

With respect to the Schedule C car and truck expenses, for each of the years at issue, petitioners provided their return preparer with the amount of business miles that they claimed they had driven during each such year, and that return preparer used the standard mileage rate to determine the amount of the deduction for such expenses that petitioners claimed in Schedule C of their return for each such year.

In Schedule E for 1993, 1994, and 1995, petitioners reported rental income from the Toledo rental property of $4,000, $5,318, and $7,397, respectively, and rental expenses from that property of $6,668, $6,330, and $10,239, respectively.

In the notice, respondent used an indirect method, the so-called source and applications of funds method, in order to determine whether petitioners had unreported Schedule C gross receipts for any of the years at issue. That was because petitioners had not maintained adequate records for any of those years. Respondent derived all of the amounts that respondent used in applying the source and application of funds method with respect to each of the years at issue from one or more of the following sources: Petitioners' joint return for each such year, petitioners' bank statements for each such year, petitioners' monthly listings for each such year, and petitioners' oral statements made to respondent's revenue agent who conducted the

examination of each such joint return.  In applying the source and applications of fund method for each of the years at issue, respondent prepared a so-called Cash T (Cash T) for each of those years, which reflected debits and credits for various items that respondent derived from one or more of the foregoing sources. Set forth below is the Cash T that respondent prepared for each of the years at issue:

## 1993

| | Debits | Credits |
|---|---|---|
| Schedule C gross receipts | $66,779 | -- |
| Cost of goods sold | -- | $24,121 |
| Schedule C expenses | -- | 46,510 |
| Less standard mileage rate | -- | -16,800 |
| Rental income | 4,000 | -- |
| Rental expenses | -- | 6,668 |
| Bank account balance | 6 | 8,873 |
| Personal living expenses | -- | 8,338 |
| Checks to Ms. Owens deducted as Schedule C cost of labor | -- | 1,700 |
| Truck expenses | -- | 4,900 |
| Totals | 70,785 | 84,310 |
| Less total debits | | -70,785 |
| Understatement | | 13,525 |

- 14 -

## 1994

|  | Debits | Credits |
|---|---|---|
| Schedule C gross receipts | $112,610 | -- |
| Cost of goods sold | -- | $64,514 |
| Schedule C expenses | -- | 48,813 |
| Less standard mileage rate | -- | -14,790 |
| Rental income | 5,318 | -- |
| Rental expenses | -- | 6,330 |
| Bank account balance | 8,873 | 17,265 |
| Insurance proceeds | 4,300 | -- |
| Principal payments on rental property | -- | 2,894 |
| Personal living expenses | -- | 22,669 |
| Truck expenses | -- | 9,788 |
| Totals | 131,101 | 157,483 |
| Less total debits | | -131,101 |
| Understatement | | 26,382 |

## 1995

|  | Debits | Credit |
|---|---|---|
| Schedule C gross receipts | $152,870 | -- |
| Cost of goods sold | -- | $91,607 |
| Schedule C expenses | -- | 93,953 |
| Less standard mileage rate | -- | -22,500 |
| Rental income | 7,397 | -- |
| Rental expenses | -- | 10,239 |
| Bank account balance | 17,265 | 87 |
| Insurance proceeds | 4,700 | -- |
| Purchase of Massachusetts Street property | -- | 11,090 |
| Checks to Ms. Owens deducted as Schedule C cost of labor | -- | 1,900 |
| Personal living expenses | -- | 14,047 |
| Truck expenses | -- | 12,151 |
| Totals | 182,232 | 212,574 |
| Less total debits | | -182,232 |
| Understatement | -- | 30,342 |

In the notice, respondent determined to increase petitioners' Schedule C gross receipts for each of the years 1993, 1994, and 1995 in the amounts of $13,525, $26,382, and $30,342, respec-

tively, which were the respective amounts determined for those years on the basis of respondent's application of the source and application of funds method.

In the notice, respondent also determined to disallow the claimed Schedule C car and truck expenses for 1993, 1994, and 1995 in the amounts of $11,550, $9,352, and $16,875, respectively "because it has not been established that more than $5,250.00 for 1993, $5,438.00 for 1994 and $5,625.00 for 1995 was for an ordinary and necessary business expense, or was expended for purpose designated."

In the notice, respondent also determined that the insurance reimbursements of $4,300 and $4,700 that petitioners received during 1994 and 1995, respectively, resulted in taxable gain to petitioners because they had "deducted the cost of the tools that were stolen in prior years * * * [and] your basis is zero."

In the notice, respondent also determined that petitioners are liable for each of the years at issue for the addition to tax under section 6651(a)(1) because they failed to file timely their return for each of those years.

## OPINION

Petitioners bear the burden of proving that the determinations in the notice are erroneous.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Schedule C Gross Receipts

Respondent determined that petitioners did not keep adequate records from which their taxable income could accurately be calculated. The only records of income and expense that petitioners maintained with respect to Mr. Owens' painting business and the Toledo rental property were their bank statements, the checks written on their joint bank accounts (the National City joint account until May 18, 1993, and thereafter the Peoples joint account), and petitioners' monthly summaries that they prepared from those bank statements and checks. We agree with respondent that petitioners did not maintain adequate tax records. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

In the absence of adequate records, respondent reconstructed petitioners' income on the basis of the source and application of funds method and determined that petitioners have unreported Schedule C gross receipts. The source and application of funds method of reconstructing income is based on the assumption that, absent some explanation, the amount by which a taxpayer's expenditures during a taxable year exceed the taxpayer's known sources of income is taxable income. See Erickson v. Commissioner, 937 F.2d 1548, 1553 (10th Cir. 1991); Petzoldt v. Commissioner, 92 T.C. 661, 694 (1989).

Petitioners contend that respondent's indirect method of income reconstruction was "conducted in a careless, malicious

manner" and "is entirely flawed and deceptive".[7]  On the instant record, we reject petitioners' contentions.  On that record, we find respondent's method of reconstructing petitioners' income and the results generated by that method to be reasonable.[8]

Based on our examination of the entire record before us, we find that petitioners have failed to establish any error in respondent's reconstruction of petitioners' income on the basis of the source and application of funds method.  Consequently, we sustain respondent's determinations in the notice to increase

_____

[7]Petitioners also complain that respondent's revenue agent who examined the joint returns at issue did not testify at trial. Instead, another revenue agent of respondent testified with respect to respondent's indirect method of income reconstruction in this case.  According to petitioners, they "should have the opportunity to face" the revenue agent who examined their joint returns for the years at issue.  The individual who testified on behalf of respondent (respondent's witness) was a revenue agent who, as of the time of the trial, had worked for respondent for 13 years, having served as a tax auditor responsible for the examination of individual tax returns for 9-1/2 years.  Respondent's witness testified because the revenue agent who examined petitioners' returns for the years at issue was not available to testify on the date of the trial in this case.  Respondent's witness reviewed respondent's administrative file with respect to the examination of petitioners' joint returns for the years at issue and was thoroughly familiar with the contents of that file, including all of the work papers therein and petitioners' joint returns for the years at issue.  Respondent's witness was also thoroughly familiar with the source and applications of funds method that respondent used in reconstructing petitioners' income.  We found respondent's witness to be credible and her testimony to be reliable.

[8]Petitioners make no claims that, prior to 1993, they had accumulated a large amount of cash or that they received amounts from nontaxable sources during the years at issue.

petitioners' Schedule C gross receipts for each of the years at issue.

Claimed Schedule C Deductions

Respondent disallowed petitioners' claimed Schedule C car and truck expenses for 1993, 1994, and 1995 in the amounts of $11,550, $9,352, and $16,875, respectively.[9]

Deductions are strictly a matter of legislative grace, and petitioners bear the burden of proving that they are entitled to any deductions claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

Section 162(a) allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 274(d)(4) operates to disallow any deduction otherwise allowable under, inter alia, section 162(a) with respect to, inter alia, any "listed property", unless the taxpayer satisfies the substantiation requirements of that section.[10] "Listed property" is defined in section 280F(d)(4) to

---

[9]Respondent did not disallow the remaining claimed Schedule C car and truck expenses for 1993, 1994, and 1995 in the amounts of $5,250, $5,438, and $5,625, respectively.

[10]Sec. 274(d) provides in pertinent part:

SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.

(d) Substantiation Required.--No deduction or credit shall be allowed--

(continued...)

include passenger automobiles and other property used as a means of transportation. See sec. 280F(d)(4)(A)(i) and (ii).

Petitioners acknowledge that they kept no records of the type required by section 274(d) and the regulations thereunder. Consequently, petitioners may establish their entitlement to the Schedule C car and truck expenses that respondent disallowed for each of the years at issue only by introducing into the record in this case their own statements and sufficient evidence corroborating such statements. See sec. 274(d)(4); sec. 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). We find that the general, vague, and conclusory testimony of petitioners regarding the number of miles that one or more of their vehicles was driven for business purposes during each of the years at issue does not satisfy those substantiation requirements.

Based upon our examination of the entire record before us, we find that petitioners have failed to establish that they are

---

[10](...continued)

\* \* \* \* \* \* \*

(4) with respect to any listed property (as defined in section. 280F(d)(4)),

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense or other item, (B) the time and place of the \* \* \* use of the facility or property \* \* \* , (C) the business purpose of the expense or other item \* \* \* .

entitled to deduct the claimed Schedule C car and truck expenses at issue.  Consequently, we sustain respondent's determinations disallowing those claimed expenses.

## Certain Insurance Reimbursements

Respondent determined that petitioners must include in income for 1994 and 1995 insurance proceeds in the amounts of $4,300 and $4,700, respectively, that they received as reimbursements for certain of Mr. Owens' business tools which had been stolen in prior years and the cost of which petitioners deducted in returns that they had filed prior to 1994 and 1995.

Based on our examination of the entire record before us, we find that petitioners have failed to prove that the insurance reimbursements of $4,300 and $4,700 that they received during 1994 and 1995, respectively, do not constitute income.[11]  See sec. 1.165-1(d)(2)(iii), Income Tax Regs.  Consequently, we sustain respondent's determinations with respect to those insurance reimbursements.

## Claimed Net Operating Loss Deductions

At trial, petitioners took the position that they are entitled to a net operating loss deduction for each of the years at issue, which is attributable to net operating loss carryovers

---

[11]We are not persuaded by petitioners' general, vague, and conclusory testimony regarding their alleged purchase of other tools during 1994 and 1995 that the insurance reimbursements at issue do not constitute income.

from the years 1990 through 1992. The only evidence offered by petitioners in support of that position is their general, vague, and conclusory testimony, Mr. Owens' return for 1990, and petitioners' joint returns for 1991 and 1992. Although each of the returns for 1990, 1991, and 1992 shows a loss attributable to petitioners' Schedule C business, petitioners failed to introduce any evidence establishing the loss claimed in each of those returns. The returns for 1990 through 1992 constitute nothing more than the position of petitioners that they had the respective losses claimed in those returns.

Based on our examination of the entire record before us, we find that petitioners have failed to show that they are entitled for any of the years at issue to a net operating loss deduction.

Addition to Tax Under Section 6651(a)(1)

Respondent determined that petitioners are liable for the addition to tax under section 6651(a)(1) because they filed their 1993 joint return on December 27, 1996, and their 1994 and 1995 joint returns on December 26, 1996.

Section 6651(a)(1) imposes an addition to tax for failure to file timely a tax return. The addition to tax does not apply if the failure is due to reasonable cause, and not to willful neglect. See sec. 6651(a)(1).

As we understand petitioners' position, they contend that they should not be held liable for the additions to tax under

section 6651(a)(1) because, when the return for each of the years at issue was due, they were involved in respondent's examination of their taxable years 1990 through 1992, and they did not believe that they owed any tax.  On the record before us, we find that those reasons do not constitute reasonable cause for purposes of section 6651(a)(1).[12]

Based on our examination of the entire record before us, we find that petitioners have failed to establish that their failure to file timely the joint returns in question was due to reasonable cause, and not due to willful neglect.  Consequently, we sustain respondent's determinations that petitioners are liable for each of the years at issue for the addition to tax under section 6651(a)(1).

We have considered all of the contentions and arguments of petitioners that are not discussed herein, and we find them to be without merit and/or irrelevant.

To reflect the foregoing,

Decision will be entered

for respondent.

---

[12]See <u>Klyce v. Commissioner</u>, T.C. Memo. 1999-198; <u>Likes v. Commissioner</u>, T.C. Memo. 1991-286; see also <u>Ferguson v. Commissioner</u>, T.C. Memo. 1994-114; <u>Knight v. Commissioner</u>, T.C. Memo. 1984-376.